1 **BRADLEY/GROMBACHER, LLP**
2 Marcus J. Bradley, Esq. (SBN 174156)
  Kiley L. Grombacher, Esq. (SBN 245960)
3 31365 Oak Crest Drive, Suite 240
4 Westlake Village, California 91361
  Telephone: (805) 270-7100
5 Facsimile:  (805) 270-7589
6 Email: mbradley@bradleygrombacher.com
  Email: kgrombacher@bradleygrombacher.com
7
8 Attorneys for Plaintiffs Donald Smith Jr.
  and John Amaral and the Putative Class
9

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA- SAN JOSE DIVISION**

| | |
|---|---|
| DONALD SMITH, JR., and JOHN AMARAL, individually and behalf of all others similarly situated, | **CASE NO.: 5:24-cv-02540-VC** |
| | **FIRST AMENDED CLASS ACTION COMPLAINT FOR:** |
| Plaintiffs, | **1. VIOLATION OF THE FAIR CREDIT REPORTING ACT;** |
| v. | **2. TORTIOUS INTERFERENCE WITH CONTRACTS;** |
| GENERAL MOTORS, LLC; ONSTAR, LLC; LEXISNEXIS RISK SOLUTIONS, INC., | **3. INVASION OF PRIVACY;** |
| | **4. UNJUST ENRICHMENT;** |
| Defendants. | **5. VIOLATION OF CALIFORNIA'S INVASION OF PRIVACY ACT;** |
| | **6. VIOLATION OF CALIFORNIA'S CONSTITUTIONAL RIGHT TO PRIVACY;** |
| | **7. VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT; AND,** |
| | **8. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW** |
| | **JURY TRIAL DEMANDED** |

Plaintiffs, Donald Smith, Jr. and John Amaral, ("Plaintiffs") individually and behalf of all others similarly situated, by and through their attorneys, bring this class action complaint against Defendants General Motors, LLC ("GM"), OnStar, LLC ("OnStar"), and LexisNexis Risk Solutions, Inc. ("LexisNexis") (each individually, "Defendant" and collectively, "Defendants"), and allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge.

## I.   INTRODUCTION

1.     This is a class action lawsuit regarding Defendants' covert collection of consumers' driver behavior data through computer software installed in automobile vehicles or via linked application, and the sharing, use, and sale of that data without consumers' notice, knowledge, or consent.

2.     Automobile vehicles are no longer simply analog machines free of computers and digital software.  Nearly every component of a modern-day automobile is integrated with, or operated by, digital electronics and software.

3.     Today, digital software records and stores a variety of metrics about a vehicle's operation, condition, and performance. Examples include fuel levels and distances traveled, which are typically measured in a way which is visible and known to consumers.  However, the breadth of metrics captured by such digital software can, often (as here) unbeknownst to consumers, go beyond these general and familiar categories specific to the vehicle, and now can encompass metrics and information about drivers and their driving behavior.  These metrics, which are digitally recorded, stored, and viewed through vehicle software and applications and which are often inaccessible to and unknown by consumers, include, but are not limited to: a driver's average speed; percentage of time a driver drives at speeds over 80 miles per hour; the frequency and intensity of acceleration and braking; and late-night driving.

4.     Defendants GM and OnStar install these types of driver tracking features on numerous GM vehicles.  These features are misleadingly marketed as a user experience enhancement when, in actuality, the features are used by GM and OnStar to surreptitiously document and store driver-behavior metrics which are then sold for profit to third parties without the drivers' knowledge, notice, or consent.

5.     Unbeknownst to consumer drivers like Plaintiffs and members of the putative Classes, Defendants GM and OnStar sell the recorded driver data to credit agencies and data aggregation companies, including Defendant LexisNexis.

6.     Defendant LexisNexis then sells consumer drivers' data to companies, including but not limited to auto insurance companies who then use the ill-gotten data to increase quotes and premiums for drivers' automobile insurance.

7.     These acts carried out by Defendants are all done for profit without consumer drivers' notice, knowledge, or consent.

8.     The covert collection of consumer driver data by GM and LexisNexis without drivers' notice, knowledge, or consent, which is sold to credit and data-aggregator companies like LexisNexis, again without consumer notice, knowledge, or consent, comes at cost to the consumer: the result of this for-profit scheme is often an increase in consumers' insurance quotes and premiums.

9.     Plaintiffs are among the many drivers whose data has been sold without their consent as part of this deceitful scheme.  Upon information and belief, Plaintiffs' Chevrolet vehicles, equipped with OnStar tracking software, collected their driver behavior data without their knowledge and consent and sold that data to Defendant LexisNexis.   As a result, Plaintiffs suffered economic injury, including increased insurance premiums.

10.     Plaintiffs bring this action for economic damages and injunctive relief on behalf of all persons whose driver behavior data were captured, collected, stored, and/or transferred and/or sold without full notice or consent.  Defendants' wrongful

conduct constitutes a violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* (Count I); tortious interference with drivers' relations with their automobile insurers (Count II); common law invasion of privacy (Count III); unjust enrichment (Count IV); and violations of state consumer protection laws including California's Invasion of Privacy Act ("CIPA"), Cal. Pen. Code §§ 630, *et seq.* (Count V), California's Constitutional Right to Privacy (Count VI), California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.* (Count VII), and California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, *et seq.* (Count VIII);

## II.   <u>JURISDICTION AND VENUE</u>

11.    This Court has original jurisdiction pursuant to the 28 U.S.C. § 1331 by virtue of Count I arising out of or relating to the FCRA.

12.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed class is a citizen of a state different from that of Defendant, (b) the amount in controversy exceeds $5,000,000.00 (5 million dollars), exclusive of interests and costs, (c) the proposed class consists of more than 100 class members, and (d) none of the exceptions under the subsection apply to this action. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

13.    This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1407, and because each Defendant has otherwise intentionally availed itself of the markets within California through business activities, such that the exercise of jurisdiction by this Court is proper and necessary. Defendants have been afforded due process because they have, at all times relevant to this matter, individually or through their agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state,

and/or marketed, advertised, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiffs and putative members of the Classes, which arose out of the acts and omissions that occurred in the state of California, during the relevant time period, at which time Defendants were engaged in business activities in the state of California. Defendants have substantial aggregate contacts throughout the United States, as well as in the state of California, and this District. Defendants have engaged, and continue to engage, in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, the state of California, and this District, and Defendants have each purposely availed themselves of the laws of the United States and the State of California.

14.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this District, and in this state. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants conduct substantial business in this District, have sufficient minimum contacts with this District, and otherwise purposefully avail themselves of the markets in this District. Defendant GM has marketed, advertised, sold, and leased vehicles in this District. Defendants OnStar and LexisNexis also marketed, advertised, and sold their services within this District.

15.   Venue is also proper in this District because Plaintiffs and many Class members reside in the Northern District of California and throughout the state of California.

## III. **PARTIES**

16.   Defendant LexisNexis is a Delaware corporation with its principal place of business in Alpharetta, Georgia. At all times relevant to this Complaint,

LexisNexis obtained drivers' behavior data and made it available to third parties including automobile insurance companies.

17.     Defendant GM is a Delaware limited liability company with its principal place in Detroit, Michigan.  At all times relevant, GM sold vehicles in California that included functionality for driving tracking software or applications, including but not limited to, OnStar, MyChevrolet, and MyCadillac.

18.     Defendant OnStar is a Delaware limited liability company with its principal place of business in Detroit, Michigan.  At all times relevant in this Complaint, OnStar operated driving tracking software or applications in California, including but not limited to OnStar, MyChevrolet, and MyCadillac.

19.     Plaintiff Donald Smith, Jr. is a citizen of Palo Alto, California.  From March 2021 through March 2024,  Plaintiff leased and drove a 2020 Chevrolet Bolt, manufactured and sold by GM and capable of supporting driver tracking software or applications operated or maintained by GM and/or OnStar. From March 2024 to present, Plaintiff his driven a different 2020 Chevrolet Bolt, which he purchased.

20.     Plaintiff John Amaral is a citizen of San Jose, California.  Plaintiff purchased a 2024 Chevrolet Silverado in September 2023, manufactured and sold by GM and capable of supporting driver tracking software or applications operated or maintained by GM and/or OnStar.  Plaintiff has driven the vehicle from the time of purchase to present.

## IV.     <u>FACTUAL ALLEGATIONS</u>

### a.   **Plaintiff Donald Smith, Jr.**

21.     Plaintiff Donald Smith, Jr. leased a 2020 Chevrolet Bolt from a Chevrolet dealer in California from March 2021 through March 2024.  In March 2024, Plaintiff purchased a different 2020 Chevrolet Bolt, which he continues to drive.

22.     Plaintiff was never informed by GM or OnStar that his driver data would be collected and sold to third parties.

23.     Plaintiff registered and paid for OnStar related services in connection with his use of both vehicles.

24.     Plaintiff did not authorize GM or OnStar to collect and sell his personal driver data.

25.     Plaintiff downloaded the MyChevrolet application for his vehicle and was not informed by the application prior to, during, or after the download of the application that his personal driver data would be collected by GM and/or OnStar and subsequently sold to third parties.

26.     Plaintiff was never informed by GM or OnStar that use of the MyChevrolet application would result in the collection of his personal driver data or that his personal data would be sold for profit to third parties, including and specifically Defendant LexisNexis.  Plaintiff was never conspicuously informed, through his MyChevrolet application or otherwise, that he could opt-out of the collection and storage of his driver behavior data through OnStar.

27.     Plaintiff maintained insurance coverage through Geico and suffered increased insurance after leasing his vehicles.

28.     At no time prior to or after the lease of his vehicles did Plaintiff consent to the transmission of his personal driver behavior data to LexisNexis.

29.     Upon information and belief, Plaintiff's automobile insurance company accessed his LexisNexis report.

30.     Upon information and belief, the rise in Plaintiff's insurance premiums were a direct and proximate result of Defendants' collection of and sale of Plaintiff's personal driver behavior data to third parties, including his automobile insurance company, without Plaintiff's consent which constitutes unlawful deceptive acts and trade practices, an invasion of privacy, and a tortious interference, all which served to unjustly enrich Defendants.

/ / /

/ / /

**b.   Plaintiff John Amaral**

31.   Plaintiff John Amaral purchased a Chevrolet Silverado from a Chevrolet dealer in California from in September 2023, which he has driven since the time of purchase.

32.   Plaintiff was never informed by GM or OnStar that his driver data would be collected and sold to third parties.

33.   Plaintiff registered for OnStar related services in connection with his use of his vehicle.

34.   Plaintiff did not authorize GM or OnStar to collect and sell his personal driver data.

35.   Plaintiff had OnStar automatically installed in his vehicle and was not informed by the application prior to, during, or after the download of the application that his personal driver data would be collected by GM and/or OnStar and subsequently sold to third parties.

36.   Plaintiff was never informed by GM or OnStar that use of the OnStar application would result in the collection of his personal driver data or that his personal data would be sold for profit to third parties, including and specifically Defendant LexisNexis.  Plaintiff was never conspicuously informed, through his OnStar application or otherwise, that he could opt-out of the collection and storage of his driver behavior data through OnStar.

37.   Plaintiff maintained insurance coverage through AAA and suffered increased insurance premiums prior to purchasing his vehicle in 2024.

38.   At no time prior to or after his purchase of his GM vehicles did Plaintiff consent to the transmission of his personal driver behavior data to LexisNexis.

39.   Upon information and belief, Plaintiff's automobile insurance company accessed his LexisNexis report.

FIRST AMENDED CLASS ACTION COMPLAINT

40.     Upon information and belief, the rise in Plaintiff's insurance premiums were a direct and proximate result of Defendants' collection of and sale of Plaintiff's personal driver behavior data to third parties, including his automobile insurance company, without Plaintiff's consent which constitutes unlawful deceptive acts and trade practices, an invasion of privacy, and a tortious interference, all which served to unjustly enrich Defendants.

**c.     GM and OnStar's Covert Collection, Tracking, and Transmission of Driver Behavior Data**

41.     GM vehicles starting with model year 2015 have the capability to use OnStar software and related applications.

42.     The software and applications, including and specifically, MyChevrolet, MyBuick, and MyCadillac, allows GM and OnStar to record, collect, store, and transmit data regarding vehicle condition (i.e. engine or transmission status, etc.), as well as driver specific data.   This driver specific data includes metrics with reports of average speed; percentage of time speed exceeds 80 miles per hour; the frequency and intensity of acceleration and braking; and late-night driving. This driver specific data is collected after each drive.

43.     Contrary to Plaintiffs' experience and the reports of multiple GM consumers, GM claims that it does not enroll drivers in OnStar and does not "collect driving behavior data" without consent.  However, upon information and belief, GM and OnStar collect, track, store, share, and sell driver behavior data irrespective of consumer consent. "GM doesn't just want dealers selling cars; it wants them selling connected cars."[1]

44.     Moreover, GM and OnStar do not adequately apprise and inform consumer drivers that their driver behavior data will be collected, tracked,

---

[1] https://www.nytimes.com/2024/04/23/technology/general-motors-spying-driver-data-consent.html (last accessed April 25, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

furnished, and sold to third parties.  Defendants "do[] not at all disclose clearly how GM or OnStar [will] benefit[] from the use and sale of [consumer] info."[2]

45.    Importantly, the consumer driver is not compensated for the collection and sale of his or her data.  To the contrary, GM and OnStar are compensated for the sale of the consumer driver data to third parties who then in turn resell the consumer driver data to other third parties, including and specifically automobile insurers. Reports indicate that, as of 2022, "more than eight million vehicles were included" in Defendants' surreptitious data collection scheme, which generated millions of dollars in revenue for Defendants. [3]  "There is little incremental cost in selling data you've already collected, so this revenue is mostly profit."[4]

46.    To add insult to injury, the sale of the data to automobile insurers results in higher insurance quotes and premiums for those drivers whose personal and private data has been surreptitiously sold, as it did for Plaintiffs.

47.    GM and OnStar fraudulently represent that the data collected is part of "an optional service that provides customers with information about their driving behavior to help them maximize their vehicle's overall performance, reduce vehicle wear and tear and encourage safer driving."[5] However, it appears that the truth is, this data collection is actually part of a surreptitious scheme used to increase revenue.

---

[2] *Id.*

[3] https://www.nytimes.com/2024/03/22/technology/gm-onstar-driver-data.html (last accessed April 25, 2024).

[4] https://www.forbes.com/sites/rogerdooley/2024/03/12/your-driving-data-may-be-sold-to-insurers-general-motors-reveals/?sh=5e2f4b856efe (last accessed April 25, 2024).

[5] https://www.onstar.com/support/faq/smart-driver (last accessed April 10, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

48.     GM's and OnStar's disclosures do not indicate that either party will transmit or sell consumer drivers' driving behavior data to third parties or that those third parties in turn will transmit or sell that data to automobile insurance companies.

49.     GM's and OnStar's disclosures do not indicate that the ultimate sale of that driver data to third parties will result in higher premiums, higher quotes, or the possibility of being denied an insurance policy.

50.     GM and OnStar failed to give adequate notice to its customers to properly inform them of these data selling practices to third parties or the harm the practice can cause.

51.     It wasn't until March 20, 2024 that GM and OnStar admitted to the egregious data collecting and selling practice, stating, "As of March 20, 2024, OnStar Smart Driver customer data is no longer being shared with LexisNexis or Verisk."[6]

52.     Plaintiffs and other class members suffered actual harm, and the risk of future harm, as a result of GM and OnStar's unfair and deceptive acts, including but not limited to the invasion of their privacy interests in their own data, loss of control over their own data, the sale of their own data without compensation, and adverse credit reporting and impaired credit scores.

### d.  LexisNexis's Sale of Consumer Driver Behavioral Data

53.     According to its website, LexisNexis is "a trusted decision analytics provider for industries around the globe including financial services, retail/ecommerce, logistics and telecommunications."[7]

---

[6] *Id.*
[7] https://risk.lexisnexis.com (last accessed April 10, 2024).

54.     As it relates to automobile insurers, LexisNexis states that it "help[s] insurers and automakers streamline business processes, control costs and improve customer experiences."[8]

55.     LexisNexis has an Automakers division. It offers a "Telematics Exchange" system to Automakers.  LexisNexis represents on its website:

> Our device-agnostic telematics exchange receives and normalizes data from connected vehicles, mobile apps and third-party services. The driving behavior data is used to generate scores and attributes that are easily ingested into insurance carrier workflows to influence their value chain.[9]

56.     LexisNexis describes that it "bring[s] automakers and insurance carriers together" by "turn[ing] connected car data into tangible driving behavior insights that can be leveraged within insurance carriers' existing workflows."[10]



---

[8] *Id.*

[9] https://risk.lexisnexis.com/insurance/solutions-for-automakers (last accessed April 12, 2024).

[10] *Id.*; https://risk.lexisnexis.com/insights-resources/blog-post/turn-connected-car-data-into-tangible-driving-behavior-insights (last accessed April 25, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

57.     LexisNexis collects and consolidates third-party driver data to enable automobile insurers to "boost profitability." [11] Undoubtedly, these automobile insurers boost profitability by, among other things, raising premiums.

58.     LexisNexis charges automobile insurers for driver behavioral data. According to the LexisNexis website, LexisNexis compiles data from public record as well as data received from "connected vehicles, mobile apps and third-party services." [12]

59.     LexisNexis then uses this data to "generate scores and attributes that are more easily ingested into insurance carrier workflows to help better assess risk." [13] In short, LexisNexis sells personal consumer driver data procured from companies, like Defendants GM and OnStar, without consumer notice, knowledge, consent, or benefit therefrom to automobile insurers to help those automobile insurers fatten their bottom lines, which comes at a cost to those drivers whose data has been misappropriated.

60.     LexisNexis does not disclose that the driver data it sells to automobile insurers is procured from GM and OnStar without consumer drivers' knowledge or consent.

61.     LexisNexis knowingly purchases consumer driver behavioral data that is covertly collected by GM and OnStar to the detriment of the consumers whose data have been collected.

62.     Further, this practice of covert collection of consumer driver behavioral data via scant metrics functions in such a way that it paints an incomplete picture; without proper context and additional detail, the risk reports

---

[11] https://risk.lexisnexis.com/insurance/auto?intcmp=ushp.risk-decision-making.body.ins-auto (last accessed April 10, 2024).

[12] https://risk.lexisnexis.com/insurance/auto/quoting-underwriting (last accessed April 10, 2024).

[13] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

compiled and generated by LexisNexis are not an accurate representation of the individuals such reports relate to. As such, the procedures implemented by LexisNexis do not assure maximum possible accuracy of the information concerning the individual described in the report. The data are vulnerable to being misconstrued by the undisclosed third-party users, exposing Plaintiffs and members of the putative Classes to additional and heightened economic harm.

63. Based upon Plaintiffs' experiences, information, and belief, this data is ill-gotten, and that ill-gotten nature is not openly disclosed.

64. Every party incident to these transactions – GM, OnStar, LexisNexis, and the automobile insurance companies – profit from the non-consensual, covert collection and sale of consumer driver data, except for the consumer himself. This is all to the economic detriment of consumer drivers, like Plaintiff, in the form of increased quotes and premiums.

65. Defendants collectively engaged in unfair or deceptive acts in the conduct of trade or commerce when they engaged in the conduct of profiting from the sale of consumer driver behavior data obtained without consumer driver consent, knowing that the data would be disseminated to automobile insurance companies which resulted in harm to the consumer driver.

66. Plaintiffs and other class members suffered actual harm, and the risk of future harm, as a result of GM's and OnStar's unfair and deceptive acts, including but not limited to invasion of their privacy interests in their own data, loss of control over their own data, the sale of their own data without compensation, and adverse credit reporting and impaired credit scores.

### e. Fraudulent Concealment, Tolling, and Continued Violations

67. Plaintiffs' and proposed class members' causes of action could not and did not accrue prior to the filing of this Complaint because each Defendant actively concealed and did not reveal their improper collecting, tracking, accessing, recording, storing, furnishing, or selling of driver behavior data.

68.     Plaintiffs and other class members exercised reasonable diligence but could not discover each Defendant's wrongful conduct at an earlier time.

69.     Because of this, Plaintiffs and other class members did not discover, nor could they have discovered through reasonable and ordinary diligence, each Defendant's deceptive, fraudulent, and unlawful conduct alleged herein. Each Defendant's fraudulent misrepresentations caused Plaintiffs and other class members to believe that their driver behavior data was not being improperly accessed or sold.

70.     In the alternative, any statute of limitation or prescriptive period is equitably tolled on account of fraudulent concealment. Each Defendant affirmatively concealed from Plaintiffs and other class members its respective unlawful conduct.

71.     Each Defendant's wrongful conduct and misrepresentation constitutes continuing violations for purposes of any limitations period.

## V.   CLASS ACTION ALLEGATIONS

72.     Plaintiffs bring this action both individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) against Defendants on Plaintiffs' own behalf and on behalf of the Class(es) defined below, to the extent class members from these jurisdictions can be grouped together for purposes of class treatment, and within the applicable limitations periods:

**THE NATIONWIDE CLASS:** All persons residing in the United States who, within the applicable statute of limitations, had their vehicle's driving data collected by Defendants and shared with, for profit or otherwise, a third party without their consent (collectively, the "Class Members").

**THE CALIFORNIA CLASS:** All persons residing in California who, within the applicable statute of limitations, had their vehicle's driving data collected by Defendants and shared with, for profit or otherwise, a third party without their consent (collectively, the "California Class Members").

73.     Excluded from the Class(es) are: (a) any judge or magistrate presiding over this action, and members of their families; (b) each Defendant and its employees, officers, directors, and agents; (c) each Defendant's legal representatives, assigns, and successors; and (d) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

74.     Plaintiffs reserve the right to narrow or expand the foregoing class definitions, or to create or modify subclasses, including state-specific subclasses, as the Court deems necessary.

75.     Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class(es).

## NUMEROSITY

76.     While the exact number of class members cannot be determined without discovery, upon information and belief, GM and OnStar shared and/or sold millions of consumer drivers' driver behavior data to third parties for profit including, but not limited to, LexisNexis without their consent, and LexisNexis shared and/or sold millions of consumer drivers' driver behavior with third parties for profit. The Class(es) are therefore so numerous that joinder of all members is impracticable.

## COMMONALITY AND PREDOMINANCE

77.     Common questions of law and fact predominate which include, but are not limited to:

   a.   Whether Defendants GM and OnStar collected and tracked Plaintiffs' and Class Members' driving behavior data through their GM mobile application without their consent;

   b.   Whether Defendant LexisNexis knowingly purchased Plaintiffs' and Class Members' driving behavior data that had been collected without their consent;

   c.   Whether Defendants' practices are an invasion of privacy;

d. Whether Defendants' practices are unfair and/or deceptive;

e. Whether Defendants' conduct was knowing and willful;

f. Whether Defendants' contracts were uniformly misleading in a way;

g. Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages, and the measure of such damages;

h. Whether Defendants should be enjoined from such conduct in the future.

78. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that predominate this action.

## **TYPICALITY**

79. Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs, like all Class Members, had his driving telematics data collected and shared with third parties without his knowledge or consent. Plaintiffs and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims thus arise from the same practices and/or course of conduct that give rise to the claims of all Class Members.

## **ADEQUACY**

80. Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the Classes and have no interest(s) adverse to, or in conflict with, the classes they seeks to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex customer protection class actions of this nature.

## **SUPERIORITY**

81. A class action is superior to any other available means for the fair and efficient adjudication of this controversy. No unusual difficulties are likely to be encountered in the management of this class action.

FIRST AMENDED CLASS ACTION COMPLAINT

82.    The damages and other financial detriment suffered by Plaintiffs and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants. As such, it would be impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not.

83.    Further, individual litigation could potentially result in vastly different rulings and/or standards of conduct for Defendants. For example, one court may enjoin Defendants' conduct whereas another may not. The potential for such inconsistent or contradictory judgments will increase delay, burden, and expense to all parties and the court system.

84.    Here, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## <u>COUNT I</u>

**Violation of the Fair Credit Reporting Act (the "FCRA") 15 U.S.C. § 1681e(b)**

**(Plaintiffs and the Class Members v. LexisNexis Only)**

85.    Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

86.    Plaintiffs bring this claim on behalf of themselves and all similarly situated Class Members in California and Nationwide.

87.    Plaintiffs and the Class Members are each a "person" and a "consumer" within the meaning of the FCRA.  15 U.S.C. § 1681a.

88.    When a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual described in the report.   15 U.S.C. § 1681e(b).

89.     LexisNexis failed to maintain procedures to maintain maximum possible accuracy regarding Plaintiffs' and the Class Members' driver behavior data before disseminating it to auto insurance carriers.

90.     Auto insurance carriers who received this information from LexisNexis obtained an inaccurate representation of Plaintiffs' and the Class Members' driver behavior data.

91.     The foregoing acts and omissions constitute willful or negligent violations of the FCRA, including but not limited to 15 U.S.C. § 1681e(b).

92.     As a result of each willful violation of the FCRA, Plaintiffs and the Class Members are entitled to actual and statutory damages pursuant to 15 U.S.C. § 1681n(a)(1), punitive damages pursuant to 15 U.S.C. § 1681n(a)(2), and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from Defendants.

93.     As a result of each negligent noncompliance with the FCRA, Plaintiffs and the Class Members are entitled to actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from Defendants.

## COUNT II

### Tortious Interference with Contracts

### (Plaintiffs and the Class Members v. All Defendants)

94.     Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

95.     Plaintiffs allege this claim for relief on behalf of themselves and all similarly situated Class Members, both those in California and in other states, the laws of which do not conflict with California law.

96.     Plaintiffs and the Class Members had contracts with their auto insurance carriers.

97.    Defendants had knowledge of these contracts and willfully and intentionally procured a breach of them without justification.

98.    Defendants' wrongful accessing, recording, storing, and furnishing of the Plaintiffs' and Class Members' driving data to auto insurance carriers unlawfully interfered with these contracts.

99.    Defendants intended to harm or interfere with Plaintiffs' or the Class Members' contracts with their auto insurance carriers.  Defendants collected and shared driver behavior data with auto insurance carriers knowing that this data could only be used to affect drivers' auto insurance rates.

100.   No privilege or other justification exists to excuse the Defendants' tortious interference.

101.   Defendants' tortious interference has directly and proximately caused Plaintiffs and the Class Members to suffer damages including, but not limited to increased auto insurance rates and an invasion of their privacy in an amount to be ascertained at trial.

## COUNT III

### Invasion of Privacy

### (Plaintiffs and the Class Members v. All Defendants)

102.   Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

103.   Plaintiffs allege this claim for relief on behalf of themselves and all similarly situated Class Members, both those in California and in other states, the laws of which do not conflict with California law.

104.   Plaintiffs and the Class Members have a right against improper intrusion into their private affairs.  This includes a right of privacy in their own personal data, including their driver behavior data.  Within the confines of a vehicle, consumers have a reasonable expectation of privacy that their driver behavior is a private affair.

105.   The Defendants intentionally intruded upon Plaintiffs'and the Class Members' right in their private affairs by intentionally accessing, recording, storing, furnishing, and/or selling their driver behavior data to auto insurance carriers.

106.   The Defendants' intrusion was substantial and unreasonable and led to the unwanted exposure of Plaintiffs'and the Class Members' private affairs.

107.   As a direct and proximate result of Defendants' intrusion, Plaintiffs and the Class Members have suffered damages including, but not limited to increased auto insurance rates and an invasion of their privacy in an amount to be ascertained at trial.

<h1 align="center">COUNT IV</h1>

<strong>Unjust Enrichment/Quasi-Contract</strong>

<strong>(Plaintiffs and the Class Members v. All Defendants)</strong>

108.   Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

109.   Plaintiffs allege this claim for relief on behalf of themselves and all similarly situated Class Members, both those in California and in other states, the laws of which do not conflict with California law.

110.   Plaintiffs and the Class Members allege this Count in the alternative to the Counts above pursuant to Fed.R.Civ.P. 8(d)(2).

111.   GM and OnStar were unjustly enriched by selling GM vehicles to Plaintiffs and the Class Members that contained software that tracked their driver behavior data and failing to disclose that they may track, sell and/or share that data. GM and OnStar were also unjustly enriched because they used or sold Plaintiffs' and the Class Members' driver behavior data to third parties without their knowledge or consent.

/ / /

/ / /

112.   LexisNexis was unjustly enriched by offering, furnishing, and/or selling the Plaintiffs' and the Class Members' driver behavior data to auto insurance carriers without their knowledge or consent.

113.   Plaintiffs and the Class Members conferred a benefit on GM and OnStar by using or purchasing GM vehicles that contained software that tracked their driver behavior data.  Plaintiffs and the Class Members also conferred a benefit on GM, OnStar, and LexisNexis through providing their driver behavior data.

114.   Defendants realized the benefit conferred on them because they profited from accessing, offering, furnishing, or selling Plaintiffs' and the Class Members' driver behavior data without their knowledge and consent or without providing any financial compensation to them. Defendants have thereby violated fundamental principles of justice, equity, and good conscience.

115.   It would be unjust for the Defendants to retain the profit, benefit, and other compensation obtained as a result of their wrongful conduct without compensating Plaintiffs and the Class Members.

116.   Plaintiffs and the Class Members did not have an express contract with Defendants that permitted the collecting and sharing of their driver behavior data with auto insurance carriers in return for compensation.

117.   Plaintiffs and the Class Members have no adequate remedy at law for the harm caused to them.

118.   Plaintiffs and the Class Members seek restitution from the Defendants and request the disgorgement of all profits, benefits, and other compensation obtained by them through their wrongful conduct.

## COUNT V

**California's Invasion of Privacy Act ("CIPA"), Cal. Pen. Code §§ 630, et seq.**

**(Plaintiffs and the California Subclass Members v. All Defendants)**

119.   Plaintiffs incorporate the foregoing allegations as though fully set

forth herein.

120.  Cal. Pen. Code § 630 provides that "[t]he Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communication and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

121.  Defendants' acts and practices complained of herein, which Defendants engaged in for purpose of storing and tracking indefinitely the location information of car owners, like Plaintiffs and California Subclass Members, and thus determining their movements over time (and all other inferences derivable therefrom), without their consent violated and continues to violate Cal. Pen. Code § 637.7.

122.  Cal. Pen. Code § 637.7(a) prohibits the use of an electronic tracking device to determine the location or movement of a person. As used in Cal. Pen. Code § 637.7, "electronic tracking device" means "any device attached to a vehicle or other movable thing that reveals its location or movement by the transmission of electronic signals." Cal. Pen. Code § 637.7(d).

123.  In direct violation of this prohibition, and without the consent of Plaintiffs or California Subclass Members, Defendants continued to record, store, and use the location and movement of Plaintiffs' and California Subclass Members' vehicles and provide that information to third parties.

124.  As described herein, Defendants utilized "electronic tracking devices" as defined by Cal. Pen. Code § 637.7(d), in that Defendants used "devices"—the vehicles' own telematics systems, including, but not limited to, onboard diagnostics systems and built-in GPS functionality, which are mechanical or electronic equipment—attached to, and located within, Plaintiffs' and each

California Subclass Member's vehicle (a "movable thing") to "reveal[] its location or movement by the transmission of electronic signals."

125.   Defendants unlawfully used those electronic tracking devices "to determine the location or movement of a person"—namely, Plaintiffs and California Subclass Members. Defendants engaged in such storage and tracking of Plaintiffs' and each California Subclass Member's movement after Defendants had affirmatively (but falsely) misrepresented that they would not store and track Plaintiffs' and each California Subclass Member's movement and transmit to third parties or omitted such information altogether.

126.   As a result of Defendants' violations of Cal. Pen. Code § 637.7, and pursuant to Cal. Pen. Code § 637.2, Plaintiffs and Class Members are entitled to the following relief:

     a.  A declaration that Defendants' conduct violates CIPA;

     b.  Statutory damages and/or trebled actual damages;

     c.  Injunctive relief in the form of, inter alia, an order enjoining Defendants from collecting and transmitting data of Class Members to third parties in violation of CIPA;

     d.  Injunctive relief in the form of, *inter alia*, an order requiring Defendants to destroy all data created or otherwise obtained from Class Members; and;

     e.  An award of attorneys' fees and costs of litigation as provided by CIPA, the private attorney general doctrine existing at common law and also codified at California Civil Code § 1021.5, and all other applicable laws.

## COUNT VI

### California's Constitutional Right to Privacy

### (Plaintiffs and the California Subclass Members v. All Defendants)

127.   Plaintiffs incorporate the foregoing allegations as though fully set

forth herein.

128.   Plaintiffs and the California Subclass Members have reasonable expectations of privacy in their vehicles and movements. Plaintiffs' and California Subclass Members' private affairs include their behavior in their vehicles as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Defendants' tracking.

129.   Defendants intentionally intruded on and into Plaintiffs' and California Subclass Members' solitude, seclusion, right of privacy, or private affairs by intentionally collecting data from their vehicles.

130.   These intrusions are highly offensive to a reasonable person, because they disclosed sensitive and confidential location information, constituting an egregious breach of social norms. This is evidenced by, inter alia, Supreme Court precedent, legislation enacted by Congress and the California legislature, rules promulgated and enforcement actions undertaken by the FTC, petitions and litigation initiated in the United States and abroad, as well as countless studies, op-eds, and articles decrying location tracking, and Defendants' own statements.

131.   Plaintiffs and the California Subclass Members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

132.   Defendants' actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and California Subclass Members.

133.   As a result of Defendants' actions, Plaintiffs and California Subclass Members seek damages and punitive damages in an amount to be determined at trial. Plaintiffs and California Subclass Members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and California Subclass Members and were made in conscious disregard of Plaintiffs' and California Subclass Members' rights.

134.   Punitive damages are warranted to deter Defendants from engaging in future misconduct.

## COUNT VII

**California's Consumer Legal Remedies Act ("CLRA"),**

**Cal. Civ. Code § 1750, et seq.**

**(Plaintiffs and the California Subclass Members v. All Defendants)**

135.   Plaintiffs incorporates the foregoing allegations as though fully set forth herein.

136.   Defendants are each a "person," under Cal. Civ. Code § 1761(c).

137.   Plaintiffs, as well as each member of the California Subclass, is a "consumer[]," as defined by Cal. Civ. Code § 1761(d), who purchased or leased a vehicle whose location data was collected by Defendants.

138.   Defendants' conduct, as described herein, in misrepresenting the characteristics, qualities, benefits and capabilities of the vehicles and the installed OnStar system, or omitting material information, violates the CLRA. Specifically, Defendants violated the CLRA by omitting material facts and failing to disclose their data collection and transmission practices, engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions that were intended to result in, and did result in, the collection and dissemination of Plaintiffs' and Class Members' location data:

      a.  representing that the vehicles equipped with the data collection and dissemination systems have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

      b.  representing that the vehicles equipped with the data collection and dissemination systems are of a particular standard, quality, or grade if they are of another;

      c.  advertising the vehicles equipped with the data collection and dissemination systems with intent not to sell them as advertised; and

d.  representing that the vehicles equipped with the data collection and dissemination systems have been supplied in accordance with previous representations when they have not.

139.  Defendants violated the CLRA by selling and leasing vehicles that they knew collected and transmitted information to third parties via the telematics systems.

140.  Defendants omitted from Plaintiffs and other California Subclass Members the material fact that vehicles were sold with these systems that collected and disseminated vehicles' location data. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

141.  Defendants knew, at the time they sold Plaintiffs and California Subclass Members their vehicles, of the material fact that the vehicles were equipped with data collection and dissemination systems. Defendants' conduct in selling these vehicles and omitting information about their data collection and dissemination systems was fraudulent, wanton, and malicious.

142.  Defendants' unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiffs and other California Subclass Members suffering actual damage on account of receiving a car that contained telematics systems that collected and transmitted data to third parties.

143.  Plaintiffs and the other Class Members paid vehicles that were supposed to meet certain specifications. When they received a vehicle that did not conform to these specifications, and which fell below the standards set by and described in Defendants' representations, Plaintiffs and California Subclass Members were damaged on account of having their privacy invaded; having their location data collected and transmitted to third parties; and having paid more than they would have for their vehicles had they know that the vehicles are equipped with systems that collect and disseminate their location data. Plaintiffs and the

other California Subclass Members suffered diminution in the value of their data and vehicles, and other damages recoverable under the law.

144.   Pursuant to § 1782 of the CLRA, Plaintiffs notified Defendants in writing by mail of their particular violations of § 1770 of the CLRA and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act. Plaintiffs sent the notice letter on April 29, 2024.

145.   If Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant § 1782 of the CLRA, Plaintiffs will amend this Complaint to add claims for actual, punitive, and statutory damages, as appropriate.

146.   Pursuant to § 1780(d) of the Act, attached hereto as Exhibit A is the affidavit showing that this action has been commenced in the proper forum.

## COUNT VIII

**California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, et seq.**

**(Plaintiffs and the California Subclass Members v. All Defendants)**

147.   Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

148.   The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising. In the course of conducting business, Defendants committed "unlawful" business practices by, among other things, making the representations and omissions of material facts, as set forth more fully herein, and violating Civil Code §§ 1572, 1573, 1709, 1711, 1770(a)(5), (6), (7), (9), and (16), and Business & Professions Code §§ 17200, et seq., 17500, et seq., and the common law.

149.   In the course of conducting business, Defendants committed "unfair" business practices by, among other things, misrepresenting and omitting material facts regarding the characteristics, capabilities, and benefits of the vehicles and the telematics systems they were equipped with. There is no societal benefit from such false and misleading representations and omissions, only harm. While Plaintiffs and other California Subclass Members were harmed by this conduct, Defendants were unjustly enriched. As a result, Defendants' conduct is "unfair" as it has offended an established public policy. Further, Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

150.   Defendants knew when vehicles were first sold and leased that they were equipped with telematics systems that collected and transmitted information concerning drivers and passengers to third parties.

151.   Plaintiffs allege violations of consumer protection, unfair competition, and truth in advertising laws in California, resulting in substantial harm to consumers. Defendants' acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the UCL's "unfair" prong. There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein.

152.   The UCL also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendants committed "fraudulent business act[s] or practices" by, among other things, prominently making the representations (which also constitute advertising within the meaning of Business & Professions Code § 17200) and omissions of material facts regarding the characteristics of the vehicles, the telematics systems they were equipped with, and their data collection and dissemination activities.

153.   Defendants' actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading, and likely to deceive the consuming public within the meaning of the UCL.

154.   Plaintiffs and California Class Members were deceived as a result of their reliance on Defendants' material representations and omissions, which are described above. Plaintiffs and other California Subclass members suffered injury in fact and lost money as a result of purchasing deceptively advertised vehicles by having their privacy invaded; their location data collected and transmitted to third parties; paying more than they would have for their vehicles had they know that the vehicles are equipped with systems that collect and disseminate their location data; and incurring other consequential inconvenience, aggravation, damages, and loss of money and time.

155.   Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Plaintiffs desires to purchase or lease GM vehicles again in the future if they can be assured that Defendants no longer engage in and profit from undisclosed data collection and dissemination activities, and that their representations to consumers are truthful and no longer omit material facts. Accordingly, injunctive relief is appropriate.

156.   Plaintiffs, on behalf of themselves and all others similarly situated, seek restitution from Defendants of all money obtained from Plaintiffs and the other members of the California Subclass collected as a result of unfair competition, an injunction prohibiting Defendants from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other Class Members, prays for relief and judgment against Defendants as follows:

A.  Certifying this action as a Class Action with the Classes requested above, designates the Plaintiffs as the Class Representatives, and appoints the undersigned counsel as Class Counsel;

B.  Declaring that all Defendants are liable on the causes of action above;

C.  Providing for preliminary and/or final injunctive relief that precludes Defendants from further collecting and disclosing the driver behavior data of Plaintiffs and the Class Members and prohibits the disclosure of any previously-collected data to any third parties with the written consent of Plaintiffs and/or the Class Members;

D.  Awarding Plaintiffs and the Class Members with monetary relief, including actual damages, statutory damages, and punitive damages;

E.  Awarding Plaintiffs and the Class Members restitution and disgorgement;

F.  Awarding Plaintiffs and the Class Members exemplary damages, should the finder of fact determine that Defendants acted with malice or oppression;

G.  Awarding Plaintiffs and the Class Members with pre-judgment and post-judgment interest to the maximum extent allowable;

H.  Awarding Plaintiffs and the Class Members with reasonable attorneys' fees, expert witness fees, costs, and expenses; and

I.  Awarding Plaintiffs and the Class Members with such other relief as allowable under law.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

FIRST AMENDED CLASS ACTION COMPLAINT

1

## **JURY DEMAND**

2    Plaintiffs respectfully request a trial by jury on all causes of action so

3  triable.

4  Date:  May 14, 2024          **BRADLEY/GROMBACHER LLP**

5

6                              By:  /s/ Kiley L. Grombacher

7                                   Kiley L. Grombacher

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT